No.  22-50158

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

**B.W.**

**Plaintiff, Appellant**

**v.**

**AUSTIN INDEPENDENT SCHOOL DISTRICT,**

**Defendant, Appellee**

_____

**On Appeal from the United States District Court;**
**Western District of Texas Austin Division;**
**Before the Honorable Lee Yeakel, Judge Presiding**
**1:20-cv-00750**

_____

**APPELLANT'S PETITION FOR REHEARING *EN BANC***
_____

Respectfully submitted,

/s/ Martin J. Cirkiel
Martin J. Cirkiel
Texas Bar No. 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

**LEAD COUNSEL FOR APPELLANT**

## **CERTIFICATE OF INTERESTED PERSONS**

In compliance with Fed. R. App. P. 28.2.1 and Fifth Circuit Local Rule 28.2.1, Counsel notes the number and styling of this case, is as follows:

B.W., Plaintiff, Appellant v. Austin Independent School District, Defendant, Appellee, No. 22-50158, IN THE UNITED STATES COURT OF APPEALS, FOR THE FIFTH CIRCUIT.

Further, and also in compliance with these rules, the undersigned counsel for Plaintiff-Appellant certifies that they know of no other persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this particular case save for the parties noted in the style of this case and their counsel of record. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/  Martin J. Cirkiel
MARTIN J. CIRKIEL
Attorneys for Plaintiffs-Appellants

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

RULE 35(b)(1) STATEMENT- PETITION FOR REHEARING *EN BANC* . . . . . 1

I.    ISSUES PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

II.    STATEMENT OF THE PROCEEDINGS  . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    BRIEF REVIEW OF THE FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    STATEMENT OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . 5

    III.    ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    THE PANEL'S DECISION IN BRIEF . . . . . . . . . . . . . . . . . . . . . . 6

    B.    THE PANEL FAILED TO ADHERE TO CONTROLLING CASE LAW
        WHEN DETERMINING B.W. WAS NOT A VICTIM OF RACE-
        BASED ANIMUS, AND TO THE EXTENT HE WAS, SUCH
        HARASSMENT WAS NOT SEVERE AND PERVASIVE . . . . . . 8

IV.    CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

Slip Opinion filed on January 9, 2023, attached hereto and incorporated herein as if fully set forth as Exhibit A.

**Federal Cases**

**Supreme Court Cases**

Davis v. Monroe County Bd. Of Ed., 526 U.S. 629 (1999) . . . . . . . . . . . . .  passim

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998)  . . . . . . . .  8,12

**Courts Of Appeal**

Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162 (2d Cir. 2012) . . . . . . . 11

Anderson v. United States Dept. Of Housing and Urban Development, 554 F.3d 525, (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Carmichael v. Galbraith, 574 Fed. App'x. 286 (5th Cir. 2014) . . . . . . . . . . . . .  2,9

Fennell v. Marion ISD, 804 F.3rd 398, 410 (5th Cir. 2015)  . . . . . . . . . . . . . . 6,7,9

McManus v. Fleetwood Enterprises, Inc., 320 F.3d 545 (5th Cir. 2003) . . . . . . . . 12

Menzia v. Austin Indep. Sch. Dist., 47 F4th 354 (5th Cir. 2022)  . . . . . . . . . . . .  14

Norfleet v. Walker, 684 F.3d 688, 690 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . .  12

Sewell v. Monroe City School Board, 974 F. 3d 577 (5th Cir. 2020) . . . . . . . 7,9,13

Sneed v. Austin Indep. Sch. Distr. 50 F. 4th 483 (5th Cir. 2022) . . . . . . . . . . .  13

Wilson v. Birnberg, 667 F.3d 591, 595 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . .  9

**District Courts**

In re Pool Prods. Distrib. Market Antitrust Litig., 988 F. Supp. 2d 696, 713 (E.D. LA

2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Federal Statutes**

29 U.S.C. §794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20 U.S.C. § 1686 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,9,11

42 U.S.C., §2000d, Title VI of The Civil Rights Acts Of 1964 . . . . . . . . .  passim

**Federal Rules and Regulations**

Fifth Circuit Rule 28.2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Fed. R. App. P. 28.2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Fed. R. App. P. 32(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fifth Circuit Rule 32.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fifth Circuit Rule 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. App. P. 35(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## **RULE 35(b)(1) PETITION FOR REHEARING IN *EN BANC***

B.W. files this *Petition For Rehearing En Banc* as it meets the criteria set out

in Fed. R. App. P. 35(b)(1) for such review.  Specifically, the Panel misapplied both

Supreme Court precedent and this Circuit Court's own precedent.  B.W., a Caucasian,

alleges he was bullied and harassed while at the Austin Independent School District

because of his race and experienced a hostile educational environment thereby.

Accordingly, he filed a cause pursuant to Title VI of The Civil Rights Acts Of 1964,

42 U.S.C., §2000d. The  District Court and Panel rejected the claim finding the

animus was not race-based but rather because of he was a Republican and follower

of then President Trump.  Further, that whatever racial animus existed, was not severe

and pervasive. This *Petition* should be granted because the Panel failed to follow

controlling Supreme Court and Fifth Circuit case law.

First, a reviewing Court must consider the *totality of the circumstances,* Davis

v. Monroe County Bd. Of Ed., 526 U.S. 629 (1999) when analyzing a Title VI claim.

The Panel failed to do in a number of ways but none more egregious than when

failing to consider that B.W. was harassed not only by students, but worse yet,

teachers.  Second, a close review of the facts in Davis evidences the Panel also

strayed far from controlling jurisprudence relative to a Fed. R. Civ. P. 12(b)(6)

*Motion To Dismiss.*  The Panel erred when determining their own version of the facts,

the harassment was political was more plausible than B.W.'s version, it was also racial. Moreover, the Panel also erred when it very rejected certain inferences that B.W. noted and worse yet, instead inured such inferences to the benefit of the School District, also in conflict controlling case law. *See*, <u>Carmichael v. Galbraith</u>, 574 Fed. App'x. 286 (5th Cir. 2014).

Accordingly B.W. brings forth this *Petition For Rehearing En Banc* to secure uniformity in this Circuit's decisions regarding Rule 12(b)(6) jurisprudence and regarding the *totality of the circumstances* in Title VI jurisprudence. The Panel's decision strayed from both.

## II.  <u>ISSUES PRESENTED</u>

1.    Did the Panel fail to adhere to controlling Supreme Court and Fifth Circuit case law, regarding the *totality of the circumstances*, when analyzing B.W. claim he was a victim of race-based animus?

2.    Did the Panel fail to adhere to controlling Supreme Court and Fifth Circuit case law regarding a 12(b)(6) *Motion To Dismiss*, when determining the racial animus B.W. did experience was not severe and pervasive.

## III.  <u>STATEMENT OF THE PROCEEDINGS</u>

3.    BRIEF REVIEW OF THE FACTS

1.    B.W. was born in 2003. He is a Caucasian, devout Christian. In the Fall

of 2017, B.W. was harassed because he was a Republican and supported President Trump but it soon took on a racial tone, as it did throughout the country.[1] In band two students talked about the evils of the white race. The School Principal Malott 'yanked' B.W.'s ear bud out, asking 'are you listening to Dixie.[2] In Math, Ms. Cathey, *repeatedly* (emphasis added) would in a derogatory manner say, 'You need help Whitey' or "can't figure this one out whitey?" ROA.427-430.[3]  For the Spring Semester the racial animus but worsened.[4]  It effected his sleep patterns, eating habits, as his lunch often came home untouched and he failed a state-wide exam.[5]  He came home crying as the Student Council President D.K. created a *meme* of B.W. as a

---

[1]. *See* Trumps MAGA Hats Have Become A Potent Symbol Of Racism, http://www.cnn.com; 2019/01/21, 'Opinions;' *see also* MAGA Is Becoming A Symbol Of White Supremacy, http://dailyiowan.com, 2019/01/27, 'Column.'

[2]. Mentioning 'Dixie' in this context raises an *inference* of race-based animus.

[3]. While Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 has 'solely' language in it, Title VI does not.  The facts the hostile educational environment started politically and continued to be spotted with political hostility, is of no matter.  The issue, once again was there also race-based animus that was severe and pervasive.   The facts as pled, and taken together, show that it was.

[4]. During one discussion a teacher made him leave class and go outside by himself in the cold.  He believes it is part of the *totality of the circumstances* and *hostile educational environment* the panel should have considered, not obviated.

[5]. This creates an inference the harassment and hostile environment had spread from a few classroom to the school cafeteria and was becoming more pervasive. An element of a Title VI claim is that the student experienced a deprivation of equal access to public educational opportunities as compared to his non-harassed peers.  The School District never argued that B.W. did not experience a deprivation of educational opportunity.

hooded Klu Klux Klansman.[6]  Left unrequited, the race-based animus followed him

to high school where it worsened. ROA.430- 431.  There D.K. now likened B.W. to

a Nazi[7] and spread his hatred of B.W. to his friends who kicked B.W. in the cafeteria

and called B.W. a racist.  When Ms. Mauser overheard B.W. talking with a friend, she

commented on him being 'white.' Another teacher made a racially toned comment in

Language Arts.  Students that B.W. did not know would approach him and call him

a racist.[8] Another teacher called him a racist.  When a pledge of allegiance was heard,

a  student  commented  it    was  only  for  white  people.  These  derisive  comments

continued on a daily basis and often multiple times per day in class, halls, cafeteria,

gym, locker room and in public areas across campus. ROA.433-435.

2.    In the Spring of 2019 it became physical. I.L. traced a swastika[9] in front

of B.W. and then beat him up and later told everyone he did it because B.W. was

white. Importantly, I.L was a student from the same class where a teacher insulted

---

[6].  It is true that D.K.'s intent may have been because of B.W. was a 'conservative" but a *meme* of B.W. in a Klu Klux Klan apparel is of a different character. It surely raises an *inference* of race-based animus.  Moreover, the use of this image with his face, is much more harmful than simple verbal harassment.

[7].  An overt and obvious *inference* of race-based animus and its spread.

[8].  Calling someone a racist is self-evident of another *inference* of race-based animus.   Of course, when harassed by a group of students is an important consideration. *See* Davis at 629, noting the totality of the circumstances.

[9].  Another obvious *inference* of race-based animus.

B.W.[10]    During this period the same MAPS teacher made another comment about B.W. being white.  B.W. continued to be an object of derision and is called a racist, cussed at and now physically harassed, and flicked off on a daily basis by both D.K.'s and I.L.'s friends all over the campus.  He was so scared he wouldn't use the bathroom.[11]  ROA.436-439.  A student destroyed his computer. Ms. Palmer asked B.W. in Music Class, if he "enjoyed his White Gospel Music.[12]" ROA.440-441.  The Spring 2020 Semester saw the COVID19 Pandemic and the schools were shut down though just before a student threatened to kill B.W. ROA.441. B.W. never returned to the school.

B.    STATEMENT OF THE PROCEEDINGS

3.    B.W., brought forth a claim he was a victim of discrimination based upon race, pursuant to Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §2000d ("Title VI"). To have a plausible claim he must be bullied and harassed because of his race ( Caucasian), that such harassment was severe and pervasive creating a hostile educational environment,  that a School District official with the ability to take

---

[10].  Clearly the students believed they not only could harass B.W. but had permission from teachers to do so.

[11].  Later the District agreed to let B.W. use a private bathroom.  Surely, this too is not just an inference that the bullying was severe and pervasive, but an admission it was.

[12].  In this context another *inference* of race-based animus.

relevant action knew of the harassment, that the students (and teachers) were under the control of the District, that the District was deliberately indifferent to the harassment, and he experienced a loss or deprivation of educational opportunities or 'hostile educational environment' because of such indifference. Moreover, in making this determination the court must consider the *totality of the circumstances* which includes the age of the harasser and victim, number of individuals involved, types of harassment, whether verbal or physical and the extent of the loss of educational opportunities for the victim. *See* Fennell v. Marion ISD, 804 F.3rd 398, 410 (5ᵗʰ Cir. 2015) *citing* Davis v. Monroe County Bd. Of Ed., 526 U.S. 629 (1999). Based upon the School District's R. 12(b)(6) *Motion To Dismiss*[13] the only live issues for review were whether or not B.W. was bullied and harassed because he was white and whether it was severe and pervasive. In regard to these points, the Panel wrote the following.

## IV. <u>ARGUMENT AND AUTHORITIES</u>

A.    THE PANEL'S DECISION IN BRIEF

---

[13]. The District agrees the complaint states "political facts *about* race" ... but were not attacks on Plaintiff because of his race." Here the District wanted the Court and later this Circuit's Panel, to accept this inference, that of course should have inured to B.W.'s benefit, not the District's. They claim the racist comments were little more immature behaviors and not actionable citing <u>Davis</u> for this proposition. The District does not address the hostile educational environment claim as to students but only as to teachers. There they admit certain comments by the teachers were race-related but were vague and "would not amount to a racially hostile environment under Title VI.

4.    The Panel wrote at Slip Op. at p. 10 that:

".... We first observe that the bulk of the Complaint's allegations do not mention B.W.'s race at all. And the few that do are not 'so severe, pervasive, and objectively offensive that can be said to [have] deprive[d] [B.W.] of access to educational opportunities or benefits provided by [his] school[s].[14]"

And at Slip Op. at p. 13- 14:

"Here B.W. does not allege that any of the epithets akin to those used in <u>Fennell</u> were directed to him.  Or does he point to the frequency of racially motivated verbal harassment like that in <u>Sewell</u>."[15]

..... Furthermore, the allegations that B.W. argues should be considered within the *totality of the circumstance* (emphasis added) lie outside the scope of racial animus.'  For example, B.W. contends that "the use of a Klu [*sic*] Klux Klan *meme* and later being called a Nazi and racist over and over represents [*sic*] a type of racial animus like no other.' But this one of his many flawed attempts to conflate political with racial animus. B.W. argues that *we may infer* (emphasis added) that the political animus he suffered had racial undertones as well. By his reasoning, an attack on a white person because of his conservative or Republican views is necessarily an attack on him because of his race. But the *inferences* (emphasis added) required to come to this conclusion are unreasonable as membership in either

---

[14].  The Panel did not address the overall hostility of the environment upon B.W. or its effect upon his sleep, grades, eating habits and even toileting.

[15].  Taken together the facts show that for a certain period he was a victim of verbal taunting daily in a number of areas of the campus, by numerous students and even staff.   Being aligned as a Nazi or Klu Klux Klan member is surely its own form of insidious taunting. Moreover <u>Fennell</u> also considered not only student animus but derisive comments by staff.   Here the Panel failed to follow *Fennell* as to both.

group is not foreclosed to those who are not white."[16]

And at Slip. Op. at p. 14, fn. #1 the Panel writes at length about

B.W.'s allegations of teacher upon student harassment but rejects its

applicability in this case because B.W.:

"Cites no authority for the proposition that a cause of action exists
under Title VI for teacher-on-student harassment.[17]

As noted above B.W. contends the Panel erred by failing to follow controlling

Supreme Court case law, and even its own opinions as to both Title IX (and Title VI)

Jurisprudence and standards of review as to a 12(b)(6) *Motion To Dismiss*.

**B.    THE PANEL FAILED TO ADHERE TO CONTROLLING CASE LAW
WHEN DETERMINING B.W. WAS NOT A VICTIM OF RACE-BASED
ANIMUS, AND TO THE EXTENT HE WAS, SUCH HARASSMENT
WAS NOT SEVERE AND PERVASIVE**

5.    As the facts and allegations the Panel failed to follow controlling case

law as to the 'totality of the circumstances' and 12(b)(6) jurisprudence are

interwoven, he presents these issues together.

_____

[16]. This entire section is a prime example of the Panel failing to adhere to jurisprudence related to adjudicating a 12(b)(6) *Motion To Dismiss*.

[17]. Of course B.W. did not need to do so. First the School District never made such an argument so he had no duty to address this issue. Moreover, and in any case, its of no matter because the teacher-upon-student harassment of B.W. was nevertheless still part of the 'constellation of surrounding circumstances, expectations, and relationships," the Panel must consider- and did not. Davis at 651 citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998),

6.     It is well-settled in this Circuit that when reviewing a complaint all the facts B.W. pled must be deemed at 'as true.'   Further, that all reasonable inferences must be construed in a manner most favorable to him. If those allegations state a claim to relief that is plausible on its face, the complaint is adequate and will survive a motion to dismiss.  *See*, <u>Carmichael v. Galbraith</u>, 574 Fed. App'x. 286 (5th Cir. 2014)[18] *citing* <u>Wilson v. Birnberg</u>, 667 F.3d 591, 595 (5th Cir. 2012).  The Panel relied upon <u>Fennell</u> and <u>Sewell v. Monroe City School Board</u>, 974 F. 3d 577 (5th Cir. 2020)[19] in support of the proposition that the animus B.W. did experience was not race-based nor severe and pervasive.  Respectfully, the Panel erred when it strayed way too far from <u>Davis</u> and its own decisions in <u>Carmichael</u> and <u>Sewell</u>.

7.     For instance, in <u>Davis</u> at 634, LaShonda was the victim of "a prolonged pattern of sexual harassment by G.F., one of her fifth-grade classmates at Hubbard Elementary School, a public school in Monroe County" starting December of 1992. He attempted to touch her breasts and genital area and made vulgar statement such as 'I want to get in bed with you'" and "'I want to feel your boobs.'" Similar conduct

---

[18].  noting 'various occasions' and 'incidents' ... Such  [**9] acts plausibly fall outside the list of simple "insults, banter, teasing, shoving, pushing, and gender-specific conduct" which are "understandable . . . in the school setting" and are not actionable under Title IX.

[19].  It is noteworthy that the Panel in <u>Sewell</u> gave much weight to the discriminatory animus of one school administrator.  Here B.W. was the object of derision because of his race by at least a half-dozen staff persons.

allegedly occurred on or about January 4 and January 20, 1993. G.F.'s conduct continued. In February he placed a door stop in his pants and acted in a sexually inappropriate way during gym class. Another similar incident occurred about a week later in a regular classroom. Another incident occurred in gym class in March. In mid-April G.F. rubbed himself against LaShonda in the hallway. Between December and May, LaSonda was a victim of sexual harassment by this one student, for about 8 incidents, which occurred in the gym, class room and hallway[20] Her bodily integrity was never attacked yet still the Supreme Court found, at least at the pleading stage, she had a plausible claim the harassment was both sexual in nature and severe and pervasive. It rejected the theory it was merely childish horseplay.

8.    Here B.W. was an object of derision based upon his race, on almost a daily basis. He was not just likened to be a Nazi but was also reduced to a cartoon *meme* of Klu Klux Klan member. He was bullied by not just one student like LaShonda but many. He was bullied in multiple classrooms, in the halls, before and during school, in the lunchroom and when trying to eat lunch or simply be left alone to listen to music. Worse, he was an object of derision not only by students but

---

[20]. <u>Davis v. Monroe County Bd. of Educ.</u>, 120 F.3d 1390, 1394 (11ᵗʰ Cir. 1997)

teachers as well.[21]   He was beat up specifically because he was white and his computer was destroyed. His grades dropped, was too anxious to eat at school and too scared to go to the bathroom.[22]   He finally had to leave the School District when someone threatened to kill him. Clearly B.W.'s experience was worse than LaShonda's. The Panel erred by not correctly applying <u>Davis</u> to B.W.'s case.

9.     The Panel erred when it determined the animus was more political than racial. Here the Panel strayed from Rule 12(b)(6) jurisprudence. The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by a Panel on a Rule 12(b)(6) motion."  If facts are subject to more than one interpretation, at this preliminary stage, a Court is required to interpret the facts in the way more favorable to B.W.  It may not dismiss the complaint "merely because [it] finds a different version more plausible" <u>In re Pool Prods. Distrib. Market Antitrust Litig</u>., 988 F. Supp. 2d 696, 713 (E.D. LA 2013) *citing* <u>Anderson News, LLC v. Am. Media, Inc.</u>, 680 F.3d 162, 167-68 (2d Cir. 2012), as the Panel did here.

10.     In addition to failing to consider the harassment B.W. experienced by his

---

[21].  In <u>Davis</u> at 653 the Supreme Court noted teacher upon student harassment more easily satisfies the elements of a Title IX (or Title VI) claim.

[22], In <u>Davis</u> at 650- 651 the Supreme Court noted that if a student was deprived of access to school resources, like a computer lab or athletic field would rise to the level of a deprivation of access to educational opportunities.  What B.W. experienced was worse.  Can you imagine how bad things had to have been so as to keep him from using a bathroom?

teachers as part of the constellation of or *totality of circumstances* the Panel also erred when commenting that B.W. did not fully argue a teacher-upon-student claim.[23] When determining whether a litigant has stated a claim sufficient to survive 12(b)(6) dismissal, courts are to focus on the factual allegations made *not* on whether legal theories or all claims are explicitly identified. *See* <u>Norfleet v. Walker</u>, 684 F.3d 688, 690 (7th Cir. 2012)["C]ourts are supposed to analyze a litigant's claims and not just the legal theories that he propounds."]. The inquiry is whether the plaintiff has "put the defendant on notice as to what conduct is being called for defense in a court of law" and that does not require specifically identifying legal theories. *See* <u>Anderson v. United States Dept. Of Housing and Urban Development</u>, 554 F.3d 525, 528 (5th Cir. 2008); <u>McManus v. Fleetwood Enterprises, Inc.</u>, 320 F.3d 545, 551 (5th Cir. 2003)["The plaintiff need not correctly specify the legal theory, so long as the plaintiff alleges facts upon which relief can be granted."].

11.    Moreover, Courts must refrain from dividing and categorizing incidents such that it "divorc[es] them from their context and depriv[es] them of their full force." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998).  For instance, in the underlying decision <u>Carmichael v.</u>

---

[23].  As noted above, he had no need to do so because the School District never brought it up in their *Motion To Dismiss.*

<u>Galbraith</u>, 2012 U.S. Dist. LEXIS 138206 *18 (N.D. TX- Dallas Div. Sep. 26. 2012)
that Court determined that the student failed to plead a plausible Title IX case,
because he was also 'just bullied and harassed" because he 'too short' or 'because
kids thought it as funny.' When this same type of issue was brought before the Panel
in <u>Carmichael</u> it was rightfully rejected.  Here this Panel strayed from that holding,
as well.

12.    The Panel also strayed from <u>Sewell</u>. A few points are relevant here. First,
that Panel did the consider the behavior of the Principal as particularly meaningful
in whether or not the harassment was severe and pervasive. <u>Id</u>. at 585.  While it is
true the behavior of the School Principal as to B.W. was not as horrific, it is no less
true that B.W. was an object by a number of teachers, over the course of a couple of
semesters, in numerous classrooms.  If for example, being called "whitey" by a
teacher in a derisive fashion multiple time, does not satisfy the elements of a Title VI
claim, its hard to know what does.

13.    The Panel also failed to adhere to controlling case law in two other
recent Title VI cases. For instance in <u>Sneed v. Austin Indep. Sch. Distr.</u> 50 F. 4th 483
(5th Cir. 2022) the Panel affirmed that an Afro-American Student was a victim of race-
based animus because she was likened to a Gorilla when given a 'Sassquatch Award,"
was exposed to three racial slurs over the course a few years and graffiti in the

bathroom.  That case was decided on whether or not the School District had been deliberately indifferent.  Equally in <u>Menzia v. Austin Indep. Sch. Dist.</u>, 47 F4th 354 (5th Cir. 2022) the Panel affirmed the Student with African heritage was a victim of race-based animus that was severe and pervasive.  Over the course of five months, the student was exposed to racial slurs daily, often from a group, was to told to back where she came from, on one occasion she was shoved and another had perfume sprayed in her face.  Based on what the Panel determined was race-based animus was worse that Menzia and more pervasive than Sneed, yet the Panel followed neither.

## VI.  <u>CONCLUSION AND PRAYER</u>

14.    The Supreme Court noted in a Title IX case (equally applicable to Title VI) that, "[t]he statute is broadly worded." <u>Jackson v. Birmingham Bd. of Educ.,</u> 544 U.S. 167, 179 (2005).  Here the Panel very strictly construed the facts and inferences in favor of the School District and failed to adhere to both Supreme Court and Fifth Circuit case law, when doing so.

15.    B.W.'s *Fourth Amended Complaint* meets the plausibility standards required.  Accordingly, B.W. prays that his *Petition For Rehearing En Banc* should be granted to assure that Circuit case law is construed consistently, that the previous opinion vacated, the case remanded, and for any such further relief that may be afforded, whether in equity, law or both.

Respectfully submitted,

/s/ Martin J. Cirkiel
Martin J. Cirkiel
Texas Bar No. 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
(512) 244-6658 [Telpehone]
(512) 244-6014 [Facsimile]
COUNSEL FOR APPELLANT

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that, on January 30, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system, which will send electronic notification of such filing to the following:

Mr. Christopher B. Gilbert, Attorney & Counselor At Law
State Bar. No. 00787535
So. Dist. No. 17283
cgilbert@thompsonhorton.com  (Email); and
Ms. Hailey R. Janecka, Attorney & Counselor At Law
State Bar. No. 24099491
So. Dist. No. 3151241
hjanecka@thompsonhorton.com (Email) both of
Thompson & Horton, LLP
3200 Southwest Freeway
Suite 2000
Houston, TX 77027
(713) 554-6744 (Telephone)
(713) 583-7698 (Facsimile)
Attorneys For The Austin Independent School District


/s/  Martin J. Cirkiel
Martin J. Cirkiel
Attorney Of Record For
Appellant-Plaintiff

16

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      Pursuant to Fed. R. App. P. 32(a)(7)(c) and Local Rule 32.3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) and Local Rule 32.2 because:

<blockquote>
X      this brief contains 3858  words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.2, or

this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.2.
</blockquote>

2.      Pursuant to Fed. R. App. P. 32(a)(7)(c) and Local Rule 32.3, the undersigned certifies this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) and Local Rule 32.1 because:

<blockquote>
x      this brief has been prepared in a proportionally spaced typeface using Corel Word Perfect in 14 pt. Times New Roman, or

this brief has been prepared in a monospaced typeface using Corel Word Perfect in 10½ characters per inch Times New Roman.
</blockquote>

3.      THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN FED. R. APP. P. 32(a)(7) AND LOCAL RULE 32.2, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

<blockquote>
/s/ Martin J. Cirkiel
Martin J. Cirkiel, Esq.
</blockquote>

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2023

Lyle W. Cayce
Clerk

No. 22-50158

---

B.W., *a minor, by next friends* M.W. *and* B.W., *formerly known herein as*
Jon AISD Doe,

*Plaintiff—Appellant*,

*versus*

Austin Independent School District,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-750

---

Before King, Stewart, and Haynes, *Circuit Judges*.*
Per Curiam:**

B.W., a white high school student, appeals the dismissal of his complaint against AISD alleging that he was subject to race-based harassment and retaliation once he reported the harassment. For the following reasons, we AFFIRM.

---

* Judge Haynes concurs in the judgment only.

** This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50158

## I.

The events alleged below took place between Plaintiff-Appellant B.W.'s eighth- and tenth-grade years as a student in the Austin Independent School District ("AISD"), the Defendant-Appellee in this case. All of these allegations originate from B.W.'s fourth amended complaint (the "Complaint"), the operative complaint in this action.

The Complaint alleges that B.W. first experienced harassment while he was in the eighth grade at O'Henry Middle School following a field trip in October 2017 where he wore a hat emblazoned with the slogan "Make America Great Again." According to the Complaint, there was an almost immediate "attitudinal change by staff and other students from friendly and inviting to cold and hostile." In November 2017, B.W.'s parents met with the middle school's principal, Principal Malott, after a number of unspecified "incidents" in which B.W. had been treated "poorly" "to address concerns that B.W. was becoming an object of derision because of his political beliefs." Yet, although Principal Malott promised that an action plan was forthcoming, B.W. was subject to verbal attacks "on almost a daily basis . . . because of his political allegiance to President Trump." In January 2018, B.W.'s parents again met with Principal Malott to express their concerns for B.W.'s safety and the continued absence of the promised action plan; no action plan was put in place, though, after this second meeting.

The Complaint alleges that the harassment escalated throughout the Spring 2018 semester. In February 2018, B.W. experienced "backlash and push back" after he refused to participate in a student walkout protesting gun violence. As the semester progressed, B.W. was "ostracized" for being a Republican, a supporter of former president Trump, white, and Christian. He was also "harassed" for being racist, anti-feminist, and anti-gay; B.W. asserts that he does not espouse these views. For example, the Complaint

alleges that B.W. was "made fun of . . . for being a Christian" in Latin class when another student said, "Ah, Christians should understand Latin." And "[i]n band class, two students repeatedly harassed B.W. for being Caucasian by repeating the evils of the white race in American history." The Complaint also alleges that Principal Malott participated in this "stereotypical think." On one occasion, when B.W. was listening to music using his ear buds, Principal Malott "yanked one ear bud out of his ear and stated sarcastically, 'Are you listening to Dixie?'" Principal Malott then walked away laughing to herself, and other students witnessed the entire incident.

The Complaint alleges that B.W. "experienced more and more random derogatory comments" from students and teachers after Principal Malott's remarks. One teacher, Ms. Morgan, told B.W. very loudly that she was "getting concerned about how many white people there are." An aide in B.W.'s math class, Ms. Cathey, repeatedly called B.W. "Whitey" and said, "You need help Whitey?" or "Can't figure this one out Whitey?" when he raised his hand. And Mr. Borders, a teacher, "was very hostile toward B.W." for the entirety of a school field trip. On another occasion, a student pointed to the cross around B.W.'s neck and loudly stated, "I don't like that your [*sic*] forcing your religion on me." B.W. was left in tears following an incident involving his former friend and then-student council president, D.K. D.K. had created a meme of B.W. as a hooded Ku Klux Klansman, and later admitted to creating the meme because his father had told him not to be friends with anyone who was a conservative.

In May 2018, B.W. wore his "Make America Great Again" hat while receiving his diploma at his middle school graduation. Mr. Borders responded by "meanly saying" to B.W.: "Ya know, we're trying to create a safe environment here!" The Complaint alleges that there were "no apparent consequences for anyone at O'Henry . . . for the way B.W. had been

mistreated, simply because B.W. held a different political belief than other students and apparently met the harasser's stereotypical prejudices."

The Complaint alleges that the animus toward B.W. continued into his freshman year at Austin High School. At the beginning of the Fall 2018 semester, D.K. approached B.W. about the Ku Klux Klan meme he had created of B.W. during the previous school year. B.W. then filed for and received a "Stay Away Agreement" between himself and D.K. a few days later, but D.K. and his friends "continued to harass" B.W. after the Stay Away Agreement went into effect. On one occasion, D.K. approached B.W. in front of a group of students saying, "So you really said that? Gay people don't exist?"; B.W., however had never made such a statement. The Complaint alleges that "Staff" then met with D.K. and his parents regarding his treatment of B.W., but D.K.'s behavior toward B.W. did not improve after this meeting.

B.W. struggled with other members of the student body that semester as well. He was insulted and kicked for wearing a Ted Cruz shirt. In his ELA class, B.W. asked if he could write a paper on the Second Amendment; the other students in the class responded by chanting "School Shooter! School Shooter!" while the teacher, Mr. Meadows, looked on in silence. And later in the semester, another student "mockingly asked" B.W., "Why are you a racist?" That same day, the same student approached B.W. again, this time in front of other students as well, and stated that B.W. was a "[f]ucking racist." Later in the semester, B.W. was the only student to rise in his home room class for the Pledge of Allegiance when it came on over the loudspeaker; a student then told B.W., "America is only for white people."

The Complaint also describes various interactions between B.W. and his teachers during the Fall 2018 semester. On B.W.'s birthday, his MAPS teacher, Mr. Mathney, walked into class and loudly stated, "Woke up this

morning to see all the stupid things Trump had done!" During debate class, the teacher, Ms. Cooney, loudly stated, "Trump is running [*sic*] our democracy and he is a liar." A few days after Halloween, Mr. Meadows asked the ELA class if anyone had any Halloween candy. When B.W. offered some of his, Mr. Meadows responded, "Your candy would be filled with hate and oppression" in front of the entire class. And when a substitute teacher, Ms. Mauser, overheard B.W. and his friends having a conversation regarding a girlfriend during a MAPS class, she told B.W., "I will not have a white man talk to me about gender issues!"

In September 2018, B.W. and his parents filed their first grievance with the school board describing their previous complaints regarding B.W.'s treatment and the lack of any investigation into those incidents. Two months later, after the family met with school officials, the high school assistant principal, Steven Maddox, was assigned to investigate B.W.'s parents' concerns. The Complaint alleges that B.W. began to suffer from retaliation shortly after the investigation was opened. A few days after the meeting with school officials, D.K. purposefully bumped into B.W. and said, "I don't deserve what's happening to me." D.K.'s friends also approached B.W. asking, "Why he's a homophobe?" and "Why he's a racist?" In December 2018, Assistant Principal Maddox provided a written response that summarized the conclusions from his investigation. In the written response, Assistant Principal Maddox determined that there was no teacher bias and harassment. He also concluded that D.K.'s treatment of B.W. qualified as bullying according to AISD's policies and procedures. Assistant Principal Maddox then spoke with D.K. and his parents and had B.W. and D.K. sign another Stay Away Agreement.

The Spring 2019 semester was no different for B.W. The Complaint alleges that the "verbal bullying and harassment" occurred multiple times a day and included B.W. being called a racist, "cussed at," and "flicked off"

daily, often in front of teachers who never intervened. After B.W. had expressed his political opinion during a class discussion, the substitute teacher, Ms. Mosher, responded "When you are old enough to think for yourselves [*sic*], you will no longer be a conservative." She then proceeded to kick B.W. out of the class and into the cold outside. The Complaint alleges that Ms. Mosher generally "verbally harasse[d]" B.W. in front of his classmates "because of his political support for Republican Ideology."

In February 2019, B.W. was attacked while helping a fellow student with a math assignment. B.W. was using his laptop, which had stickers supporting Donald Trump on its casing. The encounter began when another student, I.L., began tracing a swastika on the back of the student that was being helped by B.W. I.L. then told B.W., "I'm going to beat the shit out of you." The next thing B.W. remembers is that he was lying on the ground bleeding after being struck multiple times. B.W. and his family reported this incident to the AISD police the next day, but the Complaint alleges that no action was taken. B.W. later discovered that I.L. had told others that I.L. had assaulted B.W. because B.W. was white; B.W. also heard that I.L.'s friends were "out to get [B.W.]" In March 2019, B.W. brought a poster of Justice Antonin Scalia to his debate class. The teacher, Ms. Cooney, was visibly irritated, yelled at B.W., and also told him, "You're pissing me off!" in front of the entire class.

The Complaint alleges that the harassment continued throughout B.W.'s sophomore year of high school as well. Like he was during the prior school year, B.W. was called a racist, "cussed at," and "flicked off" daily. D.K. and his friends also "continued to harass and intimidate B.W." I.L.'s friends did so as well and would try to trip B.W. as he would walk by. On one occasion, a student told B.W., "if you support Trump you must be stupid." In September 2019, B.W. returned to his debate classroom to retrieve his poster of Justice Scalia, but the poster was no longer there. In November

2019, B.W. was "berated" while serving as an aide in the attendance office by Ms. Lindsay when she saw a Trump/Pence sticker on his new computer. And during the Fall 2019 semester, while B.W. was in the locker room after cross country practice, "a number of African American students came in and said 'here are all the white boys!'" In March 2020, while B.W. was talking with some friends at lunch, a girl standing next to the group turned to look directly at B.W. and said very loudly, "Oh my Fucking [*sic*] God, I'm going to kill all Trump supporters, I don't give a shit who hears it. I want to kill all of them." After an investigation, the AISD police determined that they would be taking no further action because the student who had made the threat "did not have the means to kill all Trump supporters."

All AISD schools were shut down the day after the incident at lunch due to the COVID-19 outbreak. B.W. never returned to school and was homeschooled during the following 2021–22 school year. Throughout the period in question, B.W. and his family repeatedly submitted both formal and informal complaints to school administrators recounting the alleged bullying and harassment. The Complaint alleges, though, that school administrators never acted to remedy the bullying and harassment.

On July 14, 2020, B.W. filed his initial complaint, asserting claims against AISD for violations of his First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 and for negligence. In its fifth iteration that was filed on May 27, 2021, the Complaint maintains the § 1983 claims and adds claims seeking redress under Title VI of the Civil Rights Act of 1964 and Chapters 106 and 110 of the Texas Civil Practices & Remedies Code. With respect to the Title VI claims, which are at issue before us, the Complaint alleges that AISD knew that B.W. was being harassed because of his race and race-based stereotypes, yet "failed to keep him safe from harm, and failed to provide him an environment that was not hostile," *i.e.*, that AISD acted with deliberate indifference. Additionally, the Complaint alleges that B.W. was a

victim of retaliation due to his reporting of the harassment subject to Title VI. On May 28, 2021, AISD moved to dismiss the Complaint.

On January 28, 2022, the magistrate judge, who had been referred AISD's motion, issued his report and recommendations and recommended that the Complaint be dismissed in its entirety. Regarding the Title VI claims, the magistrate judge reasoned that the Complaint was devoid of facts that would evince race-based harassment and that the few racially related allegations resembled "political statements about race made in B.W.'s presence." Furthermore, the magistrate judge determined that the few racially related harassment allegations occurred too infrequently to meet the standard for a race-based harassment claim under Title VI. The magistrate judge also concluded that B.W. had inadequately pleaded his Title VI retaliation claim because the Complaint did not allege that B.W.'s harassers were aware that he had filed grievances with either school. On February 15, 2022, the district court accepted and adopted the magistrate judge's report and recommendations. On appeal, B.W. only challenges the dismissal of his Title VI claims.

## II.

We review a district court's grant or denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6) *de novo. Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016). To survive such a motion, a complaint must allege enough facts, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, the complaint must include "factual allegations that when assumed to be true 'raise a right to

relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Conclusory statements or "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint pleading facts "that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Whether the plausibility standard has been met is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## A.

Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI "prohibits only intentional discrimination." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 407 (5th Cir. 2015) (emphasis omitted) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). A school district receiving federal funds may also be liable for student-on-student harassment under Title VI's deliberate indifference standard if:

> (1) the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" (a racially hostile environment), and the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent.

*Id.* at 408 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644, 650 (1999)). Harassment "must be more than the sort of teasing and bullying that generally takes place in schools." *Id.* at 409 (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)); *see also Davis*, 526 U.S. at 651–52 ("Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.").

We first observe that the bulk of the Complaint's allegations do not mention B.W.'s race at all. And the few that do are not "so severe, pervasive, and objectively offensive that [they] can be said to [have] deprive[d] [B.W.] of access to educational opportunities or benefits provided by [his] school[s]." *See Fennell*, 804 F.3d at 408. Indeed, each of these few incidents occurred within a period spanning over two-and-a-half years and was perpetrated by a different actor. Of these incidents, only one is truly severe—where I.L. made it known that he had assaulted B.W. because he was white. But this alone is not enough to establish harassment, even when considered alongside the few, less severe, race-based allegations. Accordingly, taken together, these few, relatively mild, and isolated incidents do not meet the standard for race-based harassment.

Two cases from this circuit are illustrative of this point. In *Fennell v. Marion Independent School District*, three black sisters alleged that their school district was deliberately indifferent to a racially hostile educational environment. 804 F.3d at 402. The district court dismissed their case on summary judgment. *Id.* at 401–02. This court affirmed the judgment on appeal but held that, while there was no genuine dispute as to the school

district's deliberate indifference, the plaintiffs had raised a genuine dispute that a racially hostile environment existed. *Id.* at 409–10. Specifically, there were multiple instances of nooses being left for black students (or their parents) to find, which on one occasion was accompanied by a note that was filled with racial animus and epithets, *id.* at 402; frequent use of the n-word and other epithets were directed at black students, *id.* at 403–04; one of the plaintiffs was "admonished" for her hairstyle by the athletic director who referred to it offensively and required her to cut and redye her hair, *id.* at 404; one of the plaintiffs received a text from a white classmate of an animation of Ku Klux Klan members chasing former president Barack Obama, *id.* at 405; a teacher told one of the plaintiff's classes that "all black people [are] on welfare," *id.* at 405; and another plaintiff was told by her peers that "[b]lack girls [aren't] pretty enough to be cheerleaders" when she tried out for the cheerleading squad, *id.* at 406. The school district contended that the harassment was "too periodic and sporadic to constitute a racially hostile environment," but we disagreed. *Id.* at 409. First, we reasoned that "[t]here is no question . . . that repeatedly being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race is harassment far beyond normal schoolyard teasing and bullying." *Id.* (internal quotations omitted). Relatedly, we also determined that the incident where a noose was accompanied "by a vitriolic and epithet-laden note . . . underscore[d] the severe, pervasive, and objectively offensive nature of the harassment." *Id.* Second, although we recognized that racial epithets being directed at black students may have occurred more infrequently than on a biweekly basis, we were persuaded that the degree to which those remarks were offensive counseled finding that they amounted to racial hostility. *See id.* ("Furthermore, this court has held that racially offensive remarks made every few months over three years was sufficient to raise a genuine dispute of

whether a hostile environment exists under Title VII." (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))).

In *Sewell v. Monroe City School Board*, 974 F.3d 577 (5th Cir. 2020), we revived Title VI and Title IX claims that had been dismissed in the district court. There, the plaintiff-student, Jaylon Sewell, had alleged that he had suffered harassment stemming from his wearing his hair in a hairstyle that purportedly violated the school board's dress code. *Id.* at 581–82. After Sewell was prohibited from attending the first day of school due to his hairstyle, the dean of students "ridiculed him every other day by calling him a thug and a fool," and at one point asked him if he "was gay with that mess in his head." *Id.* at 581 (internal quotations omitted). The dean also discouraged students from talking with Sewell and encouraged a female student to lie and accuse Sewell of sexual assault; the dean told Sewell that he "wouldn't be getting in so much trouble if his hair were not that color." *Id.* In reversing the case's dismissal, we reasoned that it was plausible that the dean's harassment of Sewell originated "from a discriminatory view that African American males should not have two-toned blonde hair." *Id.* at 584. We noted the many ways that the dean treated Sewell and other black male students differently from students who were not black males: only black males were sent to the dean's office on the first day of school for not complying with the dress code, only Sewell was penalized for not adhering to the dress code despite other non-black and non-male students' failure to comply as well, and the verbal abuse Sewell suffered could be directly tied to his race and sex. *Id.* We therefore held that Sewell's complaint had adequately pleaded that the alleged harassment was sufficiently severe, pervasive, and offensive to deprive him of an educational benefit. *Id.* at 585. Of particular import to us were the dean's ridiculing of Sewell every other day, his discouraging of other students from talking to Sewell, and his

encouraging of another student to "concoct an allegation that Sewell had sexually assaulted her." *Id.* at 585.

Here, B.W. does not allege that any epithets akin to those used in *Fennell* were directed at him. Nor does he point to a frequency of racially motivated verbal harassment like that in *Sewell*. Instead, he argues that the "totality" or "constellation of surrounding circumstances" makes his case. In raising this argument, he points to a string of inapposite Title VI and Title IX cases. All of these cases describe events that either occurred with greater frequency or were more serious than what B.W. alleges. *See Carmichael v. Galbraith*, 574 F. App'x 286, 290 (5th Cir. 2014) (per curiam) ("Depending on the evidence at trial or summary judgment, the series of incidents where Jon's underwear was forcibly removed could plausibly constitute numerous acts of objectively offensive touching. Such acts plausibly fall outside the list of simple insults, banter, teasing, shoving, pushing, and gender-specific conduct which are understandable . . . in the school setting and are not actionable under Title IX." (internal quotations and citation omitted)); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 652 (D. Md. 2013) ("Plaintiffs' evidence supports the inference that Classmate subjected JD to a few instances of sex-charged conduct, including raunchy remarks, lewd gestures, self-exposure and, arguably, inappropriate touching."), *aff'd*, 605 F. App'x 159 (4th Cir. 2015); *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 448 (6th Cir. 2009) ("DP was repeatedly harassed over a number of years [more than 200 times in one school year]. . . . This pervasive harassment escalated to criminal sexual assault."), *abrogated on other grounds by Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960 (6th Cir. 2020).

Furthermore, the allegations that B.W. argues should be considered within the totality of the circumstances lie outside the scope of racial animus. For example, B.W. contends that "the use of a Klu [*sic*] Klux Klan *meme* and later being called a Nazi and racist over and over represents [*sic*] a type of

racial animus like no other." But this is just one of his many flawed attempts to conflate political with racial animus. B.W. argues that we may infer that the political animus he suffered had racial undertones as well. By his reasoning, an attack on a white person because of his conservative or Republican views is necessarily an attack on him because of his race. But the inferences required to come to this conclusion are unreasonable as membership in either group is not foreclosed to those who are not white. And the Complaint itself belies this reasoning as it alleges that D.K. "admitted . . . that he made the KKK meme about B.W. because D.K.'s father told him not be [*sic*] friends with anyone who was a Conservative." The Complaint is replete with examples demonstrating that most of the incidents B.W. experienced were due to his ideological beliefs. B.W. fails to connect this political animus to the racial animus that he must show for his Title VI claim. Therefore, this claim was appropriately dismissed.[1]

---

[1] B.W. references some of the incidents involving his teachers in arguing that he was subject to severe and pervasive harassment due to his race but cites no authority for the proposition that a cause of action exists under Title VI for teacher-on-student harassment. Indeed, B.W.'s claim is predicated on our holding in *Fennell* where we determined that a cause of action for student-on-student harassment may be brought under Title VI. 804 F.3d at 408–09. The bounds of our decision in *Fennell*, however, did not extend to claims for teacher-on-student harassment. B.W. has modeled his Title VI claim as one for harassment as opposed to one for intentional discrimination. And in his reply, for the first time B.W. argues that a cause of action for teacher-on-student harassment exists citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998). In that case, the Supreme Court held that one may bring a deliberate indifference claim against a school district under Title IX for teacher-on-student harassment. *Id.* at 290, 292–93. In *Fennell*, we applied the Supreme Court's holding in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 646–47 (1999), that a school district may be liable for student-on-student harassment based a deliberate indifference theory under Title IX, to Title VI due to the similarities between both legislative schemes. *Fennell*, 804 F.3d at 408. It appears as if B.W. would have us extend the holding in *Gebser* to claims falling under Title VI as well by utilizing our reasoning in *Fennell*. While this argument is compelling, B.W. fails to raise it at all in his opening brief and devotes less than one sentence to it in his reply without any analysis. Therefore, we consider the argument forfeited and do not weigh

No. 22-50158

## B.

B.W. also challenges the district court's dismissal of his Title VI retaliation claim. As this circuit has done in recent decisions, we will assume without deciding that Title VI includes a claim for retaliation. *See Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 n.4 (5th Cir. 2020) ("Title IX encompasses retaliation claims. So we assume without deciding that Title VI does too." (citation omitted)); *Jones v. S. Univ.*, 834 F. App'x 919, 923 n.3 (5th Cir. 2020) ("We assume without deciding that Title VI encompasses a retaliation claim.") (per curiam); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 238 (5th Cir. 2020) ("[a]ssuming, without deciding" that a Title VI retaliation claim "is available" for the purpose of ruling on its viability at the motion to dismiss stage) (per curiam). To successfully plead such a claim, a plaintiff must show "(1) that she engaged in a protected activity; (2) that the Defendants took a material action against her[;] and (3) that a causal connection existed between the protected activity and the adverse action." *Jones*, 834 F. App'x at 923 (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *see also Sewell*, 974 F.3d at 586 ("A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against him because he complained of discrimination. That typically means the funding recipient itself signed off on the adverse action." (citation omitted)).

"As in other civil rights contexts, to show protected activity, the plaintiff in a Title VI retaliation case need only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or

---

the incidents involving B.W.'s teachers in determining that his Title VI harassment claim is not well pleaded. *See Tharling v. City of Port Lavaca*, 329 F.3d 422, 430 (5th Cir. 2003) ("issues not raised in the opening brief are deemed waived"); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

was occurring." *Peters*, [327 F.3d at 320](#) (internal quotations omitted); *see also Bisong v. Univ. of Hous.*, [493 F. Supp. 2d 896, 911](#)–12 (S.D. Tex. 2007) (applying same). In the educational context, it follows that the plaintiff must have been opposed to an unlawful educational practice. When describing the complaints to school administrators that B.W. raised in middle school, the Complaint provides scant detail as to their substance and only ever alleges that B.W. and his parents were concerned about diversity of thought and B.W. being harassed on account of his political ideology. The same can be said of most of the complaints B.W. filed in high school as well. Notably, the Complaint provides more detail regarding one particular grievance, the second formal grievance that B.W. filed. Specifically, the Complaint states that B.W. alleged violations of the First and Fourteenth Amendments and Title IX, but it omits any mention of Title VI. There are no other factual allegations that could otherwise support a reasonable inference that B.W. and his parents engaged in a protected activity, *i.e.*, that they complained to AISD that B.W. had been harassed on account of his race. Therefore, B.W. cannot satisfy the first prong of the test for a Title VI retaliation claim.

### III.

The bullying as alleged in this case is a cause for concern. But while we do not condone bullying in any form, Title VI does not support a claim for bullying generally. A plaintiff like B.W. must allege that he was harassed because of his race, color, or national origin. B.W. has failed to do so. Likewise, because he cannot show that he was engaged in a protected activity when reporting the alleged harassment to school administrators, B.W.'s retaliation claim cannot overcome a motion to dismiss. Therefore, for the foregoing reasons, the district court's dismissal of this action is AFFIRMED.